## Case No. 14,444.

UNITED STATES v. The AMPHITRITE.
[See Case No. 10,585.]

---

## Case No. 14,445.

UNITED STATES v. AMY.

[4 Quart. Law J. 163.]

Circuit Court, D. Virginia. May Term, 1859.

SLAVERY—CONSTITUTIONAL LAW—"PERSON"—LARCENY OF MAIL BY SLAVE—ACCOUNTABILITY THEREFOR.

1. Section 22 of the act of congress passed March 3, 1825 [4 Stat. 108], provides that, if "any person shall steal a letter from the mail, the offender shall, upon conviction, be imprisoned not less than two nor more than ten years." Held, that the word "person" is used in the constitution of the United States to describe slaves, as well as freemen, and that the constitution recognizes slaves both as persons and as property.

2. When the word "person" is used in an act of congress, the act may be construed as including slaves, unless there is something in the object and policy of the law, or in the provisions with which the word is associated, which manifestly indicates that it is used in a different sense, and was intended to apply to persons who are free.

3. There is nothing of this character in this act, and therefore it includes slaves.

4. The act, thus construed, is constitutional.

5. The clause in the 5th amendment of the constitution, which declares that private property shall not be taken for public use without just compensation, cannot, upon any fair interpretation, apply to the case of a slave, who is punished in his own person for an offence committed by him, although the punishment may incidentally affect the property of another, to whom he belongs. The clause applies to cases where private property is taken to be used as property for the benefit of the government, and not to cases where crimes are punished by law.

6. From the nature of our government, the same act may be an offence against the laws of the United States, and also of a state, and be punishable in both; yet in all civilized countries it is recognized as a fundamental principle of justice that a man ought not to be punished twice for the same offence, and if the slave Amy had been punished for the larceny in the state tribunal, the court would have felt it to be its duty to suspend sentence, and to represent the facts to the president, to give him an opportunity of ordering a nolle prosequi, or granting a pardon.

The slave Amy, the property of Samuel W. Hairston, of Patrick county, Virginia, was indicted for stealing a letter from the mail at Union Furnace post-office in that county, under section 22 of the act of congress passed March 3, 1825, which provides that, "if any person shall steal a letter from the mail, the offender shall, upon conviction, be imprisoned not less than two nor more than ten years." At the trial before Judge Halyburton, on the point being suggested by the defendant's counsel that a slave is not a "person" amenable to the act, his honor said the point was one of great novelty and importance, and that, as the chief justice was shortly expected, it must be adjourned for argument and consideration until his arrival. The point was therefore overruled, and the case proceeded in with the understanding that the question would be argued and decided upon a motion for a new trial in the event of conviction. The slave was convicted upon the evidence, and accordingly, on the arrival of the chief justice, the motion for a new trial on the reserved point was argued before the two judges.

John Howard (of Howard & Sands), for the owner of the defendant, Amy, contended,

(1) That as there was nothing in the act specially pointing to slaves, it applied, prima facie, only to "persons" known and acknowledged in the law generally as persons having legal rights and responsibilities, who could be tried and legally punished in the manner provided by the act, and under the usual forms of the law as administered in the United States courts; that a slave is not such a legal "person," and is not within the meaning of the act, a slave not being, in ordinary legal contemplation, a person, but property; and he cited the constitution of the United States, construed by the supreme court of the United States in Dred Scott v. Sandford. 19 How. [60 U. S.] 407, 408, 411, 425, 426, as recognizing slaves only as property, and the supreme court of appeals of Virginia as deciding in Bailey v. Poindexter, 14 Grat. 132 (see authorities there collected), and other recent cases (Williamson v. Coalter's Ex'rs. 14 Grat. 394, and Fox v. Fox's Ex'r, not yet reported), that a slave has no legal right or capacity whatever; that he is not a legal person, but a thing; that it was a well settled principle of construction that all the parts of a statute must be taken together, and the whole construed as one law; and that, in accordance with these views, the different sections of this act of congress, in respect to offences against the post-office, clearly showed that slaves were never intended to be embraced therein, since sometimes the punishment is merely a pecuniary fine, varying from $10 to $2,000, and sometimes imprisonment, sometimes both; that it was impossible, in a legal sense, either to fine a slave, or to deprive him of liberty; that a slave has neither property nor liberty to be taken away;

his legal character, so to speak, consisting in the absence of all the rights of property and liberty, so that a judgment against him, depriving him of either, to any extent, would be a mere legal nullity and absurdity. The act of congress should not be construed as contemplating so palpable a judicial solecism and impossibility. But if the act be construed as including slaves, a still more striking incongruity would follow. The constitution of the United States provides that "the trial of all crimes, except in cases of impeachment shall be by jury," which means a jury of one's peers. Such was the sense in which the terms was used in the constitution. In that sense it was immemorially understood at the common law, from which it was taken; for even in Magna Charta (in this respect the prototype of our constitution) it is expressly provided that no man shall be deprived of his life, liberty, etc., unless by the judgment of his peers, nisi per legale judicium parium suorum, etc., or, in the language of Judge Story, in his Commentaries on the Constitution, citing Coke's Institutes and Blackstone, "a trial by the country, which is a trial by a jury, who are the peers of the party accused, being of the like condition and equality in the state." 2 Story, Const. 425. If, therefore, slaves are included in this act of congress, and are to be tried according to the constitution of the United States, they must be tried by a jury of their peers, their equals, slaves like themselves; and thus would be presented the novel and anomalous spectacle of twelve negro slaves, subpoenaed from the field or the factory, presided over by the learned judges of the court, and addressed by the district attorney as "gentlemen of the jury,"—slaves solemnly determining the legal rights of their fellow-slaves, who, in contemplation of law, have no rights, and disposing of the lawful property of their masters, themselves but mere property like that of which they dispose. Such solecisms and absurdities as these plainly enough show that slaves never were intended to be included within the provisions of this act of congress.

(2) If, however, they were intended to be so included, then the act was unconstitutional, inoperative, and void, as to them. The principles recognized and established by the supreme court of the United States in Dred Scott v. Sandford clearly apply to this case. There, it is true, the only matter in issue was whether an emancipated negro, whose ancestors were brought from Africa, and sold into this country as slaves, is a citizen of a state, in the sense in which the word "citizen" is used in the constitution of the United States; and the court decided that he is not; and that therefore he cannot sue as a citizen in the United States courts. It is also true that the court expressly stated that they were by no means prepared to say that there are not many cases, civil, as well as criminal, in which a circuit court of the United States may exercise jurisdiction, although one of the

African race is a party. That broad question was not before the court. Nor is that broad question now before this court. The question is not whether the court may not exercise jurisdiction in any case in which a freed negro is a party; but whether it has jurisdiction in a case in which a negro slave is made a party. Aliens, citizens of the different states, not naturalized as citizens of the United States, and free negroes, all have their respective legal rights and obligations. They are sui juris, and may, or may not, be held suable or responsible in the civil and criminal courts of the United States. But with slaves it is different. They have no legal rights nor obligations. They can neither sue nor be sued. They are punishable, indeed, by the statute law of the state, and only by the positive statute law, since African slavery is unknown to the common law, as was decided by Lord Mansfield in Sommersett's Case, 20 How. State Tr. 1, and by the general court of Virginia in Turner's Case, 5 Rand. 678, and as has been decided by the supreme tribunals of other states of the Union. They are punishable by the statute law, yet in a mode, and to an extent, that recognizes no rights of any character in themselves, but, on the contrary, demonstrates the absolute legal dominion and supremacy of the master race, and the absolute subjection of the slave. Slaves certainly could not be sued in a civil action for damages in the circuit court of the United States. It is difficult to see how they can be made defendants to a criminal prosecution, the object of which is to enforce a fine, or the forfeiture of property, or freedom, to any extent, or in any manner. Congress has passed no positive act to that effect, and it has no authority to pass any such act. It would be to create rights and responsibilities for the slave which he cannot possess, and could not exercise and fulfil. It would be to invade the peculiar province and jurisdiction of the several states, in respect to a matter purely of domestic concern, at once of the greatest delicacy, and of the greatest magnitude and importance.

The reasoning of the supreme court in the case of Dred Scott v. Sanford [supra] abundantly supports these views. The court say that the only two provisions of the constitution of the United States which point directly and specifically to the negro race as a separate class of persons show clearly that they were not regarded as a portion of the people or citizens of the government then formed; the one clause authorizing their importation as slaves by the several states until the year 1808, and the other providing for the return of fugitive slaves to their masters; "that these provisions show conclusively that neither the description of persons therein referred to (African negroes), nor their descendants, were embraced in any of the other provisions of the constitution, for that certainly these two clauses were not intended to confer on them or their posterity the bless-

ings of liberty, or any of the personal rights so carefully provided for the citizen." "The only two provisions which point to them, and include them, treat them as property, and make it the duty of the government to protect it. No other power, in relation to this race, is to be found in the constitution; and as it is a government of special delegated powers, no authority beyond these two provisions can be constitutionally exercised. The government of the United States had no right to interfere for any purpose, but that of protecting the rights of the owner, leaving it altogether with the several states to deal with this race, whether emancipated or not, as each state may think justice, humanity, and the interests and the safety of society may require. The states evidently intended to reserve this power exclusively to themselves." [Dred Scott v. Sandford] 19 How. [60 U. S.] 425. Such is the language of the court, and therefore the law of the land, expounded by its highest constitutional tribunal. Of course, then, negro slaves are not entitled to any of the personal rights secured to the citizen, nor can they be subjected, by the federal government, to any of the civil or legal responsibilities of the citizen, since it has nothing to do with slaves, except to protect the rights and property of their owners in them as slaves. The state governments take care of their municipal discipline and control. Hence, any act of congress which contemplates and necessitates, in its administration by the courts of the United States, the exercise by the slave of any of the personal rights of the citizen, or which seeks to subject the slave to any of the civil or legal responsibilities of the citizen, or which attempts to treat or to punish him as a free man, who is liable as such to the process and coercion of the courts, is clearly unconstitutional, nugatory, and void, so far as he is concerned. A slave has no such rights to exercise or claim, and no such responsibilities can be thrust upon him. The creation of a civil or legal person out of a thing, the investure of a chattel with the toga civilis, may be an achievement of imperial power, but it is beyond the compass of an American congress. Congress must first emancipate the slave, before it can endow him with the rights of a citizen under the constitution, or impose upon him the responsibilities of a legal person, or compel him to pay money, or part with liberty. Now the act under which the slave Amy is prosecuted contemplates, implies, and necessitates in its administration by the courts the exercise by the party prosecuted of whatever right a citizen may claim under the constitution, and the 5th and 6th articles of the amendments thereto, prominent among which is the right of trial by jury, and the act cannot be enforced without compelling the party prosecuted to pay money, or part with liberty, or do both, neither of which things can be done by the slave, and neither of which has the federal government power to endow him with ·

the capacity to perform, or to compel him to perform. The act has no application to slaves; but if it is to be construed as including slaves, then it is, as to them, clearly unconstitutional, null, and void.

It is unconstitutional and void for the further reason that in condemning the slave to imprisonment, it deprives the master of the labor and services of his slave during the term of imprisonment, and thus takes "private property for public use without just compensation"; for the slave is punished for the public benefit, as a warning and example to offenders. On this account, in Virginia, a slave who is hung or transported is paid for by the state according to his value. The whole management and control of slaves, their discipline, government, and punishment, is, and ought to be, a matter purely of state, police, and municipal jurisdiction, the domestic concern of the several states, with which the federal government has no right or business to interfere. It is a subject too sacred for the touch of federal power. In the very language of the supreme court, the states "intended to reserve this power exclusively to themselves," and it will be an evil day for Virginia and the Southern states when the federal government shall assume the authority to seize and carry away our slaves to the District of Columbia, or the Northern states, for the alleged purposes of punishment, or otherwise. Nor is there any necessity in this case to institute so dangerous a precedent and innovation. This slave may well be tried, and, if guilty, properly punished under the state laws, for larceny of the letter and its contents; and that is the course with her which ought to be pursued, and to which her owner, Mr. Hairston, would interpose no objection. She ought to be whipped, and sent about her business, and not carried beyond the jurisdiction of Virginia, to Washington, there to sleep or sicken in imprisonment, from two to ten years, to the total loss of her services to her master during that time, and then to be turned loose among persons perhaps but too ready to facilitate her escape to the North. The master had no guaranty that she would ever be returned to him. It was not the duty of the marshal to return her; it was not the duty of the keeper of the Washington penitentiary; no provision was made for it in the act; and this fact, of itself, shows that the act was never intended to apply to slaves, and that, if it was, it is unconstitutional.

John M. Gregory, Dist. Atty., for the United States, resisted the motion for a new trial.

(1) Because the trial had been fair, the evidence clear to establish the guilt of the prisoner, beyond doubt and beyond cavil.

(2) The prosecution was under the 22d section of the act of congress approved March 3, 1825, entitled "An act to reduce into one the several acts establishing and regulating the post-office department." 4 Stat. 108.

There are four counts in the indictment. In each the accused was charged with a violation of the provisions contained in this 22d section, and the jury found a general verdict of guilty against her. No person who heard the evidence can doubt that the prisoner committed the offence of which she stands charged. But the counsel for the prisoner insists that the court ought not to pass judgment upon the prisoner, because she is a slave, "and as such not a legal person in the contemplation of the act of congress, a slave not being in ordinary legal contemplation a person, but property." It is true that slaves are property; but it is equally true that they are recognised in all modern communities where slavery exists as persons also. The constitution of the United States recognizes slaves as persons, and they are also recognized as persons by several acts of congress. They are recognized as persons in every state in the Union, and punishable as persons for the commission of offences in violation of the penal laws. How then can it, with any correctness, be said that a slave is not such a legal person as is amenable to the act of congress under which the prisoner has been tried and found guilty by the jury? The facts stated are so plain and well known to the court that I deem it would be but a useless waste of time to refer more particularly to authorities to sustain them. I cannot prove more plainly that the prisoner is a person, a natural person, at least, than to ask your honors to look at her. There she is. She is beyond doubt a human being, and it is not pretended she is not of sound mind. It is submitted that, although the motion for a new trial has been sustained with much earnestness and ingenuity, it must be overruled, and the prisoner sentenced, under the law, to punishment by the court.

John Howard, in reply.

No question is made as to the guilt of the prisoner, upon the evidence, if a slave be amenable to this act of congress. The defence urged is purely a legal and technical defence, but it involves principles of statutory construction in respect to slaves, of vast practical importance, and questions of constitutional right in respect to federal jurisdiction over slaves, of equal novelty, delicacy, and magnitude. (1) Are slaves within the act? (2) If so, is the act constitutional? These are the grave questions to be considered and decided.

(1) Upon the first point it is said that slaves are certainly within the act, because, although they are property, yet they are persons also; that they are recognized as persons in all modern communities in which slavery exists; that they are recognized as persons by the constitution of the United States, and by several acts of congress (of which, however, no instance was furnished), and by the laws of the several states of the Union, and are punishable as persons for the

commission of offenses in violation of penal laws. No references were deemed necessary, and none certainly were needed, to sustain these positions. And, as if in triumphant and conclusive proof that a slave is a person,—a natural person, at least, a human being,—and therefore within the act, profert is made of Amy in open court. This is the argument—the whole argument—for the United States. It is easy to see how far short it comes of proving the case of the government, that slaves are persons within this act; for it entirely overlooks a broad, radical, and most important distinction, which is the basis of all our civil and criminal jurisprudence in respect to slaves. It confounds the legal character and attributes of the African slaves in the United States, who are purely chattel slaves, with their character and attributes as natural persons. This great mistake into which, as it is humbly submitted, the learned counsel for the United States has fallen, is a mistake in which it would seem he has the company of men of high reputation. Even so philosophic a thinker as Prof. Bledsoe, who was bred to the law, and is distinguished for the accuracy of his intellectual perceptions, has, if his language be not misunderstood, fallen into the same error. Lib. and Slavery, pp. 94–102. And Mr. Cobb, the learned and intelligent author of the only respectable legal treatise upon Southern slavery, would seem, perhaps inadvertently, to have yielded his assent to the same misconception of the subject, although in other parts of his valuable work, as will presently be seen, he fully sustains the view upon which the defence of this case, on this point, is based. 1 Cobb, Slav. p. 83. It is natural, perhaps, or, at least, not a matter of surprise, that inaccurate and conflicting ideas should be current in regard to a subject of which the philosophy and the jurisprudence are alike in so inchoate and undeveloped a condition. But it is submitted, with great deference, that a few plain and simple general principles of universal assent would seem very clearly to point out the true legal character and attributes of our slaves, and to constitute the solid foundation of the only consistent and intelligent system of law in respect to the relations of the free and enslaved race. It is admitted that the African slaves among us have no voice in the government, federal or state; that they were not parties to the establishment of either; and that they have no agency in the making, administration, and execution of the laws thereunder. It is admitted that we must now take it as res adjudicata, however well it might be doubted, if an open question, that they were unknown to the common law; and therefore that all the law which is applicable to their condition is statute law. It is admitted that the parties to the state and federal governments hold and exercise the sovereign power of the political communities of the United States; and it is

further admitted that, in respect to slavery within its own limits, each state government is supreme.

These facts demonstrate that the status of the slave is a matter exclusively of state jurisdiction and of positive statute law. And we have but to inquire what is the status of the slave by the statute law of each of the states in which he exists? The direct answer is that, by the statute law of every state in which he exists, he is made absolutely and purely a chattel, and that he has no legal or civil rights or capacities whatever, and therefore no corresponding responsibilities as a legal or civil person. From the very law of his condition, thus expounded, the inference is at once obvious and inevitable that he cannot be subjected to the pains and penalties which are exclusively applicable to legal or civil persons. Accordingly, we shall find that in each slave-holding state of the Union there is virtually a separate code of penal laws for slaves; that, as was well said by the court (per Gaston, J.), in State v. Manuel, 4 Dev. & B. 20, "slaves are not, in legal parlance, persons, but property"; that in the construction of general statutes by the state courts, slaves are held not to be included, unless specifically mentioned in the act, or embraced by necessary implication; and that when the penalties of the act are of such a character that civil persons—persons having civil rights and capacities—alone can suffer them, slaves are held by that circumstance to be necessarily excluded from its provisions, and not to have been within legislative contemplation. And in the absence of anything to the contrary,—nay, indeed, with the strongest considerations demanding their recognition,—no reason is perceived why the same rules should not hold in construing this act of congress, an application of which, in a case of the first impression, is sought to be made to the same subject-matter of legislation.

Such, briefly, is the view of the legal status of slaves, and of the canons of interpretation, upon which, on this point, the defence relies. Now, obviously, it is no answer to say that "slaves are not only property, but persons also;" that they are "recognized as persons in the constitution of the United States," and are "punished as persons by the penal laws of the several states," and must therefore be held to be included in this act. For it assumes that slaves are "persons" in some legal sense that is inconsistent with the fact of their being absolute property; that they are referred to in this act of congress as "persons," if at all, in the same sense in which that word is used in the constitution, and that they are indicated in the act, by the same or by equivalent words of description, as are used in the clauses of the constitution in which they are included; and that in the penal laws of the several states, slaves are generally embraced under the word "persons," without reference to the

character of the offence, or to the kind or degree of the punishment imposed. In other words, it takes for granted the points in dispute,—begs the whole question. When it is said that our slaves are not only property, but persons also, the proposition, rightly understood, is undoubtedly true. It is true that the negro did not cease to be a natural person—a human being—by becoming a slave, and he may be punished as such by fit penalties. The very idea of a slave is a human being in bondage. A slave is, and must, of necessity, continue to be, a natural person, although he may be a legal chattel, or whatever may be his relations to the law. And it is evidently in this sense that he is "recognized" as a "person" in the constitution of the United States. Thus in the clause respecting the return of fugitive slaves, he is called "a person held to service," —that is, a slave. So in the clause authorizing their importation, until the year 1808, slaves are designated as "such persons as any of the states now existing shall think proper to admit." And so in the only other clause in which allusion is made to them,— the clause regulating the ratio of federal representation and direct taxation,—slaves are spoken of as "three-fifths of all other persons" than "free persons." It is well known that these circumlocutory forms of expression were all adopted merely to avoid the use of the word "slave" in the constitution, which, it was thought, would be a blemish upon the face of that instrument, and "which had been declined," as Roger Sherman said, "by the old congress (of the confederation), and was not pleasing to some people." 3 Mad. Papers, p. 1427. They were each used as a euphemism, instead of the word "slave," and each means a slave, and nothing more. That was the sole office and import of the expression used in each instance. The first describes him as a person held to service; the second as a person, the subject of the slave-trade, a person imported for sale, as a chattel; the third as a person who is not a "free person,"—that is, who is a slave. Certainly nothing is expressed or implied by these descriptions, in respect to the legal character or relations of the slaves so described, except a recognition, direct and emphatic indeed, of slaves as property; and such was the construction put upon these forms of expression by the supreme court in Dred Scott v. Sandford, as will be seen. The court seem to have overlooked, or to have regarded as of no significance in this aspect, that clause of the constitution in which, in fixing the ratio of representation and taxation, slaves are described as "other persons" than "free persons;" and they say, in respect to the other two clauses above quoted: "These provisions show conclusively that neither the description of persons therein referred to (slaves), nor their descendants, were embraced in any of the other provisions of the constitution; for that certainly

these two clauses were not intended to confer on them, or their posterity, the blessings of liberty, or any of the personal rights so carefully provided for the citizen. The only two provisions which point to them, and include them, treat them as property, and make it the duty of the government to protect it. No other power in relation to this race is to be found in the constitution; and as it is a government of special delegated powers, no authority beyond those two provisions can be constitutionally exercised." 19 How. [60 U. S.] 411, 425. It is perfectly clear, therefore, that the sense in which the slave is described in the constitution of the United States, as a "person," is merely as a natural person, and not as a legal or civil person,—a person having legal or civil rights and capacities, and obligations corresponding thereto. And this is obviously the sense in which the slave is recognized as a "person" in all the laws of the several states of the Union, in which he is included. It is in this sense in which he is spoken of in all the adjudications of the supreme tribunals of the states in respect to him or his legal condition. Thus in the case of Bailey v. Poindexter, before cited, he is described as "a person whose status or condition, in legal definition and intendment, exists in a denial to him of the attributes of any social or civil capacity whatever." 14 Grat. 198. Now, if this is all that is meant by saying that a slave is not only property, but a person also, no possible objection can be made to the statement. On the contrary, it is perfectly true. But it is fatal to the argument of the government in this case. For if slaves are recognized in the constitution of the United States only as natural persons, and in the laws and adjudications of the several states in the same sense, and we are therefore to recognize them in that sense in construing acts of congress, then this act of congress obviously cannot be construed as including slaves, in so far as its penalties apply only and exclusively to civil persons. And it would seem to be singularly unfortunate that recourse should have been had to the use of the word "person" in the constitution of the United States, in illustration of its meaning in this act of congress, so far as slaves are concerned. For the word "person," in that instrument, is held to include slaves only when words of description are added, such as "persons held to service," or "such persons as any of the states existing shall think proper to admit," etc.; and we have the conclusive authority of the supreme court for saying that they are not included in any other clauses of the constitution than in those in which they are thus specifically described. If, therefore, we are to hold slaves to be included in this act of congress, because the word "person" is used in the constitution as including them, analogy and common sense alike require that the act be construed to include them only in those

clauses in which they are specifically described or alluded to in like manner as in the constitution itself. And no such clauses are to be found in the act. Nay, not only so, but, on the contrary, as if to exclude the possibility of including slaves, penalties are provided in each clause, such that civil persons only can suffer, and from which slaves are exempt by the very law of their condition.

Now this view would appear thus to be conclusive of the case for the defendant, even upon the ground taken by the counsel for the United States. But it seems to be thought that slaves are something more, in legal contemplation, than chattels and "natural persons;" that they are endowed with some sort of vague, undefined civil rights and capacities, which authorizes the federal government to subject them to responsibilities as legal or civil persons. It is admitted that they are chattels,—property,—in its strictest sense; yet it is said they are "persons also." But if any thing more or other than this be meant, that slaves are natural persons, although chattels,—if it be meant that a slave is at the same time property, and, separate and apart from, and beyond, this, a legal or civil person, endowed with civil rights or capacities, and subject to correlative responsibilities, as a legal or civil person,—the proposition, so far from being true, is pregnant with its own refutation: it shows upon its face, indeed, an inherent, necessary, and self-evident absurdity and contradiction in terms. The simple and conclusive answer to every assertion of this legal solecism and impossibility is the question, if the chattel slave have legal or civil rights or capacities of any kind, or to any extent, where are his legal remedies to enforce them? or what his opportunities to illustrate their exercise? Is he known to the constitution, state or federal, except as a chattel? In what part of the law are those rights enumerated or defined? Under what forms of the law are they vindicated? Can he maintain any sort of action, or institute any sort of prosecution? Or can he be held responsible in any form of action or prosecution as a civil person,—a free man? If so, what is the case, and where is the precedent? None can be found. If it be said that the slave may bring a suit for his freedom, the reply it that this is provided for by statute, or proceeds upon the legal fiction that he is free, and is therefore entitled to be relieved from bondage; and it is easy to see that the necessity for the statute or the resort to a legal fiction demonstrates, in a more striking manner, the utter legal incapacity and impersonality of the slave. So absolute is this that, even in a suit between the executor and the distributees of the estate, the object of which is to ascertain whether or not he is emancipated by the will of his master, it is held error to make him a party. In a legal sense, he is as much "homo sed non persona" as

ever was the slave of ancient Rome, although greater security to life and limb is afforded him by the more humane genius of our institutions, and the pure spirit of an enlightened Christianity. Very clearly, then, whatever privileges of personal enjoyment, or whatever actual protection, or whatever liability to punishment, humanity, or public opinion, or public policy and legislation, or a wise and kind domestic discipline may deem compatible with, or necessary to, the proper subordination of the slave, and may concede to, or provide for, him, yet when you come to speak of his legal or civil rights and capacities, you speak of that which has no existence. So completely is his condition an abnegation of all civil rights or capacity whatever, that even his own master cannot confer upon him, by deed or will, or in any other manner, any right or privilege, gift or bequest, short of absolute freedom; and emancipation is defined to be, not in strict legal sense, a gift or bequest of freedom, but a mere renunciation of property, on the taking effect of which the slave is born into civil life. Rucker v. Gilbert, 3 Leigh, 8; Wynn v. Carrell, 2 Grat. 227; Smith v. Betty, 11 Grat. 752; Wood v. Humphreys, 12 Grat. 333, 340; Crawford v. Moses, 10 Leigh, 277; Williamson v. Coalter's Ex'rs, 14 Grat. 398. Thus, whatever may be the case elsewhere, whatever legal privileges or capacities slaves in other countries, in ancient or modern times, may have had, among us of the Southern states there is no intermediary legal condition between absolute freedom and absolute slavery,—between the high civil status of the freeman and the civil nonentity of his chattel. In the eye of the law, so far as civil relations are concerned, the slave is property, and property only. He is a chattel, and the legal attributes of a chattel are his legal attributes. All the civil rights or capacities which, as other men, he would have, as a natural person in a state of freedom, are, by the law of his condition, absolutely transferred to his master. He is but the object of the civil rights of others, and law, as to him, is a matter between his rulers, with which he has nothing to do. If it be said that, although a chattel, he cannot be divested of his characteristics as a natural person,—a human being; a human body inspired with intellect, feeling, volition, —that is conceded. It is that which makes him so valuable a chattel, and the natural character of the chattel must determine the manner and kind of treatment it receives from its owner or others. Thus a horse, or a dog, a slave, or a pet lamb, would not be treated as a bale of goods; and the rights of the owner, and the responsibilities of third persons to the owner in respect to them, would not be the same.

So in Boyce v. Anderson, 2 Pet. [27 U. S.] 158, the question was whether a steamboat company were to be held to as high a degree of responsibility,—that of common car-

riers,—in transporting a slave, as in transporting a bale of goods; and Judge Marshall said, delivering the opinion of the supreme court, that they could not be, since a slave has volition and feelings which cannot be entirely disregarded, and he could not be treated and packed away as a bale of goods, and therefore could not be under the same absolute control; but undoubtedly the legal character of the chattel in both cases was the same, as was attested by the fact of the form of action in the case being the same as that for the loss of a bale of goods.

Other and varied illustrations might easily be given. And this fact—the fact that the natural characteristics of the corpus or subject of chattel property are not the same—cannot in any wise affect the legal character of the chattel itself. There are numerous laws against cruelty to animals, for instance, and there are laws prescribing death or other punishment for certain animals in case of dangerous or troublesome insubordination, roving, or ferocity. But these laws rather show the supreme authority of the law-making power, than recognize any legal or civil rights in the brute creation,—the animals protected, or punished. And so with the laws punishing offences committed upon, or committed by, slaves. The slave is still but a chattel, in which no legal or civil personal right inheres. The fact that he is protected by the law, or is punished by the law, is no concession to him of legal rights or responsibilities, any more than in the case of other chattels, the accidents of whose natural characteristics are animate existence, and some sort of intelligence, volition, and feeling. The high and sacred moral obligations of the master—which are so generally and conscientiously fulfilled—to protect, by law, the life and limbs of the slave from wanton violence, or the safeguards adopted by the master for his own protection and that of society, do not invest the slave with any legal or civil right whatever. In full and strict accordance with this view is the latest judicial decision upon the subject, that of a tribunal which, in point alike of ability and learning, stands as high as any in the country, and deservedly commands great respect,—the supreme court of North Carolina. "A slave," says Pearson, C. J., "a slave, being property, has not the capacity to make a contract, and is not entitled to the rights, or subjected to the liabilities, incident thereto. He is amenable to the criminal law, and his person (to a certain extent), and his life, are protected. This, however, is not a concession to him of civil rights, but is in vindication of public justice, and in prevention of public wrongs." The other judges (Battle and the venerable and distinguished Ruffin) concurred in the opinion, of which these are the opening sentences, embodying the fundamental principle of the judgment which follows,—a judgment which is but a striking illustration of the utter civil nonentity of the slave. Howard v. Howard (Dec. Term, 1858) 6 Jones (N. C.) 235. So, as we have seen in the late case of Bailey v. Poindexter, 14 Grat. 198, the supreme court of appeals of Virginia speak of a slave as a "person whose status or condition, in legal definition and intendment, exists in the denial to him of the attributes of any social or civil capacity whatever." That case was twice elaborately argued, and was decided after great consideration; and, whatever may be thought of the ruling of the court in respect to the authority of the cases of Pleasants v. Pleasants, 2 Call, 319, and Elder v. Elder, 4 Leigh, 252, upon the particular point presented for adjudication, to wit, the validity of an emancipation by will made dependent upon the election of the slave between freedom and slavery, yet no doubt has ever been intimated as to the truth and legal accuracy of the great fundamental principle on which confessedly was based the judgment of the court, namely, that a slave has no legal or civil rights or capacity whatever. That principle indeed was virtually conceded by the eminent counsel who argued the cause for the slaves, and was amply sustained by the long and uniform train of decisions of the supreme tribunals of the several states of the Union cited at the bar, and commented and relied upon by the court. The decision in that case has been emphatically affirmed in the case of Williamson v. Coalter's Ex'r, 14 Grat. 394, and reaffirmed in the still more recent case of Fox v. Fox's Ex'r (not yet reported), and the principle upon which these cases are founded is admitted to be sound law, even by the learned dissenting judges (Moncure and Samuels), who so strenuously contended against its applicability to the special point then under adjudication.

Hence, it may truly be said, in the language of Daniel, J., in Dred Scott v. Sandford, 19 How. [60 U. S.] 477, that a "slave is one devoid of rights, civil or political"; and (pages 475–485): "It may be assumed as a postulate that to a slave, as such, there appertains, and can appertain, no relation, civil or political, with the state or government. He is himself strictly property, to be used in subserviency to the interests, the convenience, or the will, of his owner; and to suppose, with respect to the former, the existence of any privilege or discretion, or of any obligation to others, incompatible with the magisterial rights just defined, would be by implication, if not directly, to deny the relation of master and slave, since none can possess and enjoy as his own that which another has a paramount right and power to withhold. Hence it follows, necessarily, that a slave, the peculium or property of his master, and possessing within himself no civil nor political rights or capacities, cannot be a citizen," nor in any wise a legal or civil person; and, a fortiori, he can have none of the rights, in a qualified or unqualified degree, which appertain exclusively to a civil

person. And that it never was in the contemplation of the framers of the constitution of the United States that the federal government should have or assume jurisdiction over the slaves in the several states as legal or civil persons, and subject them to the pains and penalties applicable exclusively to such persons, is abundantly shown by the lucid and candid statement of the intelligent historian of the instrument,—a Northern man,—who cannot be suspected of stating too strongly the truth of the case against slaves. "The social and political condition of the slave, so totally unlike that of the freeman, presented a problem hitherto unknown in the voluntary construction of representative government. It was certainly true that by the law of the community in which he was found, and by his normal condition, he could have no voice in legislation. It was equally true that he was no party to the establishment of any state constitution; that nobody proposed to make him a party to the constitution of the United States, to confer upon him any rights or privileges under it, or to give to the Union any power to affect or influence his status in a single particular." 2 Hist. Const. U. S. (by George Ticknor Curtis) p. 155.

From these views and authorities, which might be illustrated and multiplied ad libitum, it would seem to be demonstrated beyond controversy that slaves are recognized in the constitution of the United States, and in the laws and by the adjudications of the several states, merely as natural persons, as persons held as property, whose legal status or condition is that of property, and property only, and not as being in any sense, or to any extent, legal or civil persons, persons having legal or civil rights and capacities, and subject to corresponding obligations or responsibilities as legal or civil persons. And this is the great and fundamental distinction of which sight has been so completely lost in the argument for the United States in this case. It is a distinction so broad and generic as to have become the foundation of the whole system of laws in all of the slave-holding states in respect to slaves. So absolute and wide-pervading is the ethnological, civil, social, and political difference between the dominant and the subject races,—the white American sovereign and the black African slave,—that they are not, and cannot be, governed by the same system of penal laws. Both the character and the number of the offences, and the kind and the degree of the penalties attached to them, are, and must, of necessity, be, different. And one striking and all-important difference arises from the inherent legal characteristics, the difference in the legal status, of the two races. An American citizen or freeman may be punished, for instance, by a fine or imprisonment, the forfeiture of money, or a temporary forfeiture, or deprivation of liberty. But, ex necessitate rei, from the very nature and law

of his condition, it is absolutely impossible to punish a slave in this manner, because he has neither property nor liberty of which to be deprived. And even if this were legally possible, yet, in respect to the deprivation of liberty and confinement to manual labor, the vast and varied difference between the social position, usual habits, and natural constitution of the white sovereign and the negro slave would render the same punishment, for the same offences by each, utterly and obviously unequal, inadequate, and unwise, if not futile or impracticable, and it is scarcely within the extremest range of legislative inconsistency, negligence, or improvidence that so enormous an incongruity and error should be contemplated or committed, in a whole system of jurisprudence; and yet that is what has been done by congress, if slaves are included within this act. Certainly no slave-holding state has a place in its penitentiary for slaves, or a provision for their punishment for crimes by confinement to manual labor. That, indeed, with some occasional relaxation of restraint, is the normal and habitual life of the negro slave, and it could never be adopted as a penalty in prevention of the peculiar peccadilloes of theft, for which he would seem to be endowed with an inborn genius and proclivity.

In ample confirmation and illustration of these views, we find the legislation of every state in the Union in regard to its slaves, and the uniform adjudications of the state courts in regard to the construction of statutes, so far as slaves are concerned. Thus Mr. Cobb well lays down the law: "The protection of the person of the slave depending so completely upon statute law, it becomes a question of importance what words in a statute would extend to this class of individuals? Generally, it would seem that an act of the legislature would operate upon every person within the limits of the state, both natural and artificial; yet, where the provisions of the statute evidently refer to natural persons, the court will not apply them to artificial. Nor will statutes ever be so construed as to lead to absurd and ridiculous conclusions. Experience has proved what theory would have demonstrated, that masters and slaves cannot be governed by the same laws. So different in position, in rights, in duties, they cannot be the subjects of a common system of laws. Hence the conclusion that statutory enactments never extend to or include the slave, neither to protect nor to render him responsible, unless specifically named, or included by necessary implication." 1 Cobb, Slav. p. 91. And so again on page 263 of the same volume it is said: "We have already seen that statutory enactments never extend to or include the slave, neither to protect nor to render him responsible, unless specifically named, or included by necessary implication. The result is that the ordinary penal code of a slave-holding state does not cover offences committed by

slaves, and the penalties thereby prescribed cannot be inflicted upon them. A moment's reflection would show the propriety of this principle. To deprive a freeman of his liberty is one of the severest punishments the law can inflict; and one of the most ordinary, especially when the penitentiary system is adopted. But to the slave this is no punishment, because he has no liberty of which to be deprived. Every slave-holding state has hence found it necessary to adopt a slave code, defining the offences of which a slave may be guilty, and affixing the appropriate penalties therefor." If, therefore, this act of congress were a state statute, or if in a state statute the same language, "any person," were used, and the same penalties attached to the offences specified, as are found in this act, and the supreme tribunal of any slave-holding state were called upon to construe it in respect to slaves, it would at once be held that there was nothing in the act specially pointing to slaves, and that the penalties attached,—the payment of pecuniary fines, or the deprivation of liberty, the forfeiture of money, or the forfeiture of freedom, or both, —conclusively showed that slaves were not in the eye of the legislature at the time of its passage, since the fulfilment of such penalties by the slave is obviously and absolutely inconsistent with the law of his condition. No reason has been assigned, and none can be shown, why the same construction should not be placed upon this act of congress. On the contrary, it is easy to see that the act must receive the same interpretation as similar statutes of the several slave-holding states; for in respect to the legal or civil status of slaves, it is conceded that the federal government has no constitutional authority or jurisdiction, and it must therefore legislate in respect to slaves, if at all, in obedience to, or in conformity with, their recognized status in the several states, who have exclusive and supreme jurisdiction upon the subject. Accordingly, from its very foundation to the present time, all the acts of the federal government touching slaves have recognized them as property, and not as persons, in any just legal sense, and in so doing have fully recognized the broad and complete contrast between the social, civil, and political condition of the dominant and the slave race, upon which is founded the separate code of penal laws for slaves which obtains in all of the slave-holding states. See article 7, Preliminary Treaty of Peace with Great Britain (8 Stat. 57); article 7, Definitive Treaty (8 Stat. 83); article 1, Treaty of Ghent (8 Stat. 218),—in all of which slaves are the subject of negotiation, "as negroes, or other property," or "slaves, or other private property"; 6 Stat. 600; Const. U. S. art. 1, §§ 3, 9; Id. art. 4, § 2; the three fugitive slave laws (2 Stat. 126, 3 Stat. 548, and 9 Stat. 462), in all of which, as in article 4, § 2, of the constitution, slaves are described as "persons held to service or labor,"

—expressions fully recognizing the right of property in them, by virtue of which their owners are entitled to demand the aid of the federal government in securing their return. And special attention is invited to the fact, so full of significance in this case, that in all the clauses of the constitution and in all the acts of congress in which slaves are spoken of as "persons" at all, they are so designated by words of particular description, and then only to indicate them as the property of their masters. In fact the whole structure of the federal government is based upon the recognition of slaves as property, while their existence as legal or civil persons is ignored, or, by a negative pregnant, denied and repudiated. Clause 3, § 2, art. 1, of the constitution, commonly cited to show that they are entitled to representation as being included among "three-fifths of all other persons," shows only that the "several states,"—that is, the political communities composing the several states; in other words, their masters,—are entitled to representation, and are subjected to taxation on their account as property. Hence, in the convention which formed the constitution, Roger Sherman said truly, with good reason, when this clause was under consideration, that "he did not regard the admission of the negroes into the ratio of representation as liable to such insuperable objections. It was the freemen of the Southern states who were, in fact, to be represented according to the taxes paid by them, and the negroes were only included in the taxes." 3 Mad. Papers, p. 1265. The slaves do not pay taxes, nor do they have any voice in the government. Their masters are taxed and are represented in the fixed ratio, on account of themselves, and of their property in slaves. So the circuit court of the United States for the Eastern district of Pennsylvania and New Jersey say: "Look at this article, and you will see that slaves are not only property as chattels, but political property, which confers the highest and most sacred political rights to the states, on the inviolability of which the very existence of this government depends: (1) The apportionment among the several states composing this Union of their representatives in congress. (2) The apportionment of direct taxes among the several states. (3) The number of electoral votes for president and vice-president, to which they shall respectively be entitled. * * * Thus you see that the foundations of the government are laid and rest on the rights of property in slaves. The whole structure must fall by disturbing the corner stones." Johnson v. Tompkins [Case No. 7,416]. Thus in all this legislation of the federal government, organic and ordinary, slaves are as fully treated as property as in the statutes of any of the slave-holding states, and their social, civil, and political inequality and degradation as completely recognized and established. There is every reason, therefore, why, in the administration by

the courts of the general acts of congress, the same rules of construction should be observed, so far as slaves are concerned, which have been established by the courts of supreme judicature in the several states in respect to the general statutes of the states. And, even in the absence of these facts, this should be true upon other considerations, which have been often and amply recognized by the supreme court of the United States. For it is well known that, although in matters of general federal jurisdiction the courts of the United States rightly adopt their own rules of construction, yet in subject-matters peculiarly of state and local concern and jurisdiction, if they do not always feel bound to adopt the rules of construction or the decisions of the state courts, great and profound respect is ever paid to them. And particularly ought this to be the case in regard to laws affecting slave property, and offences committed by or upon slaves.—subjects eminently of state and local interest and occurrence, with which, ordinarily, the federal courts have so little to do.

Now, in reference to the subject-matter of the punishment of slaves by the federal government, it is to be observed, in this connection, and especially in view of the constitutional question hereinafter to be noticed, that, so far as has been shown by the counsel for the United States in the argument of this cause, and so far as a careful examination of the acts of congress, with the view to ascertain the fact, may be entitled to confidence, congress has passed no act whatever, of a penal character, in which slaves are specifically included, either eo nomine, or by words of particular description, such as those in which they are specially designated in the constitution of the United States and the various acts of congress which have been above cited. In the vast majority of cases, in fact, the punishments are of such a character as necessarily to exclude slaves. The penal code of congress is unique, and, with the occasional exception of capital punishment for offences of great enormity, fine and imprisonment, singly or together, constitute the sole penalties imposed. Evidently this penal code was never designed to extend to slaves, for the great inadequacy and inequality of the punishments inflicted, as applied alike to citizens and to slaves, as well as the legal incongruity and impossibility of applying to slaves the penalties (applicable only to civil persons) denounced against at least nine-tenths of the offences, conclusively show that white men and freemen were alone in legislative contemplation. Even supposing that the federal government had criminal jurisdiction over slaves, nothing is easier or more natural than to account for this omission of congress to legislate upon the subject. The great mass of Southern slaves are constantly engaged in agricultural and other rural labor, under the immediate eye and control of their masters or superintendents, and far removed from contact with any of the agents or operations of the federal government. And the whole subject of the management, discipline, and punishment of slaves is so peculiarly a matter of state jurisdiction and municipal police, and so wise, effectual, and all-pervading have been the state legislation and the action of the state tribunals, and the still more general and successful administration of the patriarchal laws of the household and the plantation, that a more orderly, law-abiding, and quiet population never existed than the slave population of the South; and, what with the state tribunals, local police, and family government, congress has had no occasion to pass a separate code of laws for slaves, or to adapt the penalties of its acts to suit their legal and social condition. Certainly, under these circumstances, it is more reasonable to suppose that the case of slaves is casus omissus, than to suppose that, in relation to all offences alike, congress, composed until of late years of a majority of slave-holders, or representing a majority of slave-holding constituencies, should have designed to place the white citizen and the black slave upon an equal footing, and that, contrary to the spirit of all the other action of the federal government in regard to slaves, and in utter contempt of the established legal status of slaves in the several states, which the federal government was itself bound to respect and protect, slaves should have been treated as legal or civil persons, and subjected to penalties applicable only to such; and that, accordingly, penalties should have been provided for him, in the great mass and majority of cases, from which, unless the constitutions and laws of the several states in which he exists were to be crushed under foot, the slave, by the law of his condition, is necessarily and absolutely exempt. Yet such must be the case, if this act, which forms no exception to the general mass of penal acts, be construed to include slaves. And hence, in view of the whole penal legislation of congress (in which the phraseology is the same as that used in this act), it becomes a question of grave interest and magnitude to the slave-holding states what construction shall be placed upon its terms, so far as slaves are concerned. If for fines which they cannot possibly pay, and for all the multitude of federal offences within the range of penitentiary punishment, the slaves of Virginia, of Alabama, of Louisiana, or of Texas, are to be seized from their work by the federal arm, and whiffed away to Washington city, and there immured in prison for life, or until their fines are paid, or for any time from three months to twenty-one years, and their masters are to receive no compensation for their value or the loss of their services, and are to be put to the peril of losing them forever after their imprisonment is over, the sooner this startling new code is promulged, the better. It is impossible not to see that if slaves be included in this act, it can only be in violation of all the establish-

ed rules of statutory construction adopted in respect to them by the several states, and which, as has been shown, the federal courts are as much bound to recognize as the courts of the several states, in violation and disregard of the established legal status of slaves, and against the long and uniform course of dealing as to slave-property which has characterized the federal government in all its departments. There must, hence, be some very strong and paramount reason for including them, if all these considerations are to be overriden and trodden down. It may be said —it can only be said—that, though not included by name, nor by words of special description, as is usual in the federal state papers, and though it would seem that they were perforce excluded by the incompatibility of the penalties imposed with the fundamental law of their being, yet that they are included by necessary implication. But how can this be? So far as the mischiefs contemplated by the act are concerned, certainly no reason appears why they should not have been included. It is perfectly true that there is nothing in the object and policy of this act to exclude slaves from its provisions, or from punishment for the offences therein enumerated, since, obviously, the mail may be robbed by slaves, as well as by persons who are free; and it may be further said that, unless slaves are punishable under the act, they may be made the instruments of depredations upon the mail, guided or wielded by the hands of others, who may escape with impunity. All this, however, only shows the necessity of a law punishing slaves in an adequate and appropriate manner for such offences; and it may be a very strong and unanswerable argument to prove that they should have been included in some provision of the act, with effective and suitable penalties thereto attached. And the same remark applies with equal truth to a thousand other offences under other acts of congress, the penalties for which being merely pecuniary fines, for instance, clearly cannot include slaves. This kind of reasoning certainly shows what ought to have been done. It does not, and cannot, prove what has been done. As the exigencies of society are developed, the discovery of the necessity for a law can never be urged as proof of its existence. If so, felons would never escape, or innocent men either. So to construe an act is to make ex post facto laws. The act must be construed by its obvious intent and legal application, and not be stretched to cover all possible or supposable cases within its mischief, which might or ought to have been provided for, but were not. Looking to this act, it is seen that, so far from special reference being made to slaves, eo nomine, or by particular description, as in all state papers of the federal government in which they are confessedly included, here the penalties provided are such that slaves cannot legally suffer, or possibly be made to fulfil; from which the inference naturally and irresistibly

arises that they were not in the contemplation of congress in framing and passing the act. If the penalty imposed in all cases were merely a pecuniary fine, this certainly would be demonstrably clear, for no one could have the hardihood to contend that it is in the power of a slave to pay a fine. It is not perceived that the logic is altered by adding imprisonment to the fine in some cases, or by providing imprisonment alone in others, as in the case at bar. The whole act must be scanned and construed together. It is one law. Its very title is "An act to reduce into one the several acts establishing and regulating the post-office department." And in scanning the whole act, we see that, of some several hundred different offences for which indictments could be framed, the penalties for about one-half are pecuniary fines alone, varying from $10 to $500; the penalty for scarcely one-fourth is imprisonment alone, varying from 3 months to 21 years, and, with the exception of death in a single instance, the penalties for the rest are fines and imprisonment, in the alternative or together, the fines varying from $50 to $2,000, and the imprisonment from 6 months to 21 years. Can it be imagined that slaves were in contemplation of congress when this act was passed? An act, of which all the offences were equally within the object, mischief, and policy to be provided for, yet of which, at the least, more than two-thirds of the penalties (being mere pecuniary fines, directly, or in the alternative or cumulative) are such that slaves confessedly cannot suffer; an act of which, in fact, except in the solitary exception of the punishment by death for a single offence, all the penalties are such that the slave, by the very law of his condition, cannot be compelled to fulfil, and which, therefore, for him, are no penalties at all. Would it be doing justice to the intelligence of congress to indulge so extravagant an hypothesis? No reason can be assigned why the slave should have been in contemplation of congress in one clause of the act, rather than in another. Why, if a slave steal a letter containing no article of value, should he be held not included within the act, because the penalty is a pecuniary fine and imprisonment, while if the letter contain an article of value, he is to be held included within the act, the penalty in such case being imprisonment alone? Is he more or less a "person" in the one case than the other? If included in one clause, why not in all? If not in all, why in any? Is the circumstance of the presence of an article of pecuniary value in the letter any special reason why punishment should be imposed upon slaves, while in other cases they are exempt? Does the most important and really valuable correspondence,—correspondence communicating commercial, social, political, or military intelligence, of the largest consequence and magnitude to the parties or to the government,—usually contain any article of pecuniary value at all? Is not the

great burden of the mail composed of letters or packages containing no money, mercantile security, or other evidence of debt? Why, then, should slaves be within the object and policy of the law in respect to the least important part of the mails, and yet be excluded from offences against all the rest, which constitute the great bulk and business of the postal system? If it be said that slaves are equally within the mischief and policy of all the offences of the act, but that, evidently, as to those offences of which the penalties are pecuniary fines, or pecuniary fines and imprisonment, they were not in contemplation of congress, because they cannot pay a fine, and to imprison them until the fine be paid would be but to inflict unjust punishment upon their innocent masters, it may be said, with equal force and truth, that neither in respect to the offences of which the penalty is imprisonment alone could slaves have been in legislative contemplation, since deprivation of liberty, in a legal sense, is, by the law of his condition, as much an impossible thing to the slave as the payment of a fine by him, while in either case the loss of his services, during imprisonment, falls identically as the same unjust punishment upon his innocent owner. If, indeed, a slave cannot be imprisoned for not paying a fine, how can he be imprisoned for any other delinquency? And is not an imprisonment of the slave for an offence against the law just as much an unjust punishment of his unoffending owner as if the slave be imprisoned for not paying a fine, which is a penalty imposed by law? What is the difference in principle or in fact? If it be said that the slave has the physical capacity to suffer punishment by imprisonment, so also has he physical capacity to suffer punishment by paying a fine, though he has no legal capacity to do either; and you may as well compel the master to pay the money of the fine, as to compel him to part with the time and labor of his slave, worth more to him, in many cases, than forty-fold the fine. Surely it behooves those who contend for a construction of the act of congress which is so much at variance with the ordinary and established rules of construction, and with all the other action of the federal government concerning slaves, to reconcile these numerous contradictions and incongruities. And yet no explanation has been offered. None can be given. It is therefore respectfully, but earnestly, submitted that upon no principle of rational or consistent interpretation can the slaves be included within this act.

If the foregoing views are not wholly erroneous, it has been conclusively shown—(1) That, in ordinary legal contemplation and parlance, slaves are not regarded as persons, but as property, and that, although as chattels, they must still be and remain natural persons; yet that they are not, and, from the law of their condition, necessarily cannot be, legal or civil persons. Hence, that, prima facie, in general statutes of the states, or general acts of congress, they are not included; such statutes or acts ordinarily having reference only to legal or civil persons, and that, in order to include slaves, they must be mentioned eo nomine, or by words of special description, or by necessary implication. (2) That in the penal code of the federal government, slaves are nowhere mentioned eo nomine, or by words of special description; and that, although from the object and policy of many of the penal acts, it would seem that slaves ought to have been included, and, in the absence of anything to the contrary, might possibly be construed to be included by necessary implication, yet that, in respect to those very acts, by the character of the penalties imposed, in the great mass and majority of cases, slaves are, by the law of their condition, necessarily and absolutely exempt. (3) That of this character is the particular act, and especially the particular provision of the act, under which this prosecution is instituted. To all of which, it might be added, if need be, that neither in the summoning of slave witnesses, the most common and important witnesses for or against their fellow-slaves; nor, pursuant to that humane clause of the federal constitution which stipulates that "excessive bail shall not be required," in allowing or providing for the taking of bail in the case of slaves, who cannot enter into bail-bonds for themselves, and who are therefore, under the general law, now incapable of being bailed at all, and the constitution thus made a dead letter in that respect, so far as they are concerned; nor in adapting the mode and incidents of trial to suit the civil and social status and character of the slave; nor in providing suitable and sufficient penalties for slaves, and avoiding the inequality, fatuity, and injustice of putting the white citizens and freemen of the whole country together with the negro slaves of the South, in the same offences, and the same punishments, side by side, in paying fines, or at hard labor in prison, or otherwise; nor in providing just compensation to their owners for the loss of the services, or of the total value of slaves, when they are thus taken for the public use; nor in providing for their safe and speedy return or delivery to their owners, after the period of punishment has expired,—in none of these important respects, most, or all, of which are deemed necessary or proper to be provided for in the penal codes of all the slaveholding states, and in no view whatever do slaves, in any instance, and certainly not in this act, seem to have been in the mind and contemplation of congress. If, therefore, congress has passed a penal code for slaves at all, it has designedly enforced it by penalties which necessarily exclude them from its provisions, and it has provided no machinery for its administration by the courts.

Such is the dilemma to which the government is driven in this case.

(2) In respect to the constitutionality of the act, if it be held to include slaves, no answer to the points raised in the opening argument for the defendant has been furnished or attempted by the counsel for the government. They appear to be unanswerable, however they may be overlooked or avoided. It may be pardoned to state them more fully.

1. Congress has no constitutional authority to treat a slave as a freeman or civil person; it cannot endow him with the right to be tried as such; it cannot subject him to the obligations or penalties which can be fulfilled or discharged only by freemen, or civil persons,—therefore it cannot give him the right of trial by a jury of his peers, and it can try him by jury in no other way. Nor can it compel him to pay a fine or part with liberty,—things impossible to be done by a person in his condition. To assume this power is to assume authority to change the civil status, the legal character and relations of slaves, a matter peculiarly and exclusively of state sovereignty and jurisdiction.

2. The federal government has no constitutional authority to punish slaves at all. "The judicial power of the federal government," says St. George Tucker, "extends to all cases in law and equity arising under the constitution. Now, the powers granted to the federal government, or prohibited to the states, being enumerated, the cases arising under the constitution can only be such as arise out of some enumerated power delegated to the federal government, or prohibited to those of the several states. These general words include what is comprehended in the next clause, viz. cases arising under the laws of the United States." 1 Tuck. Bl. Comm. 418. See, also, 2 Story, Const. pp. 420, 421. And the supreme court say in Dred Scott v. Sandford: "The power of congress over the person or property of the citizen can never be a mere discretionary power, under our constitution and form of government. The powers of the government and the rights and privileges of the citizen are regulated and plainly defined by the constitution itself, * * * and the federal government can exercise no power over his person or property beyond what that instrument confers, nor lawfully deny any right which has been reserved." 19 How. [60 U. S.] 440–450. Now, in respect to slaves, the court say, as we have seen: "The only two provisions which point to them, and include them, treat them as property, and make it the duty of the government to protect it. No other power, in relation to this race, is to be found in the constitution; and, as it is a government of special delegated powers, no authority beyond these two provisions can be constitutionally exercised. The government of the United States had no right to interfere for any purpose but that of protecting the rights of the owner, leaving it altogether with the several states to deal with this race, whether emancipated or not, as each state may think justice, humanity, and the interests and safety of society require. The states evidently intended to reserve this power exclusively to themselves." Id., pp. 425, 426. If, then, it be true, as it is universally conceded to be true, that the federal government is a government of special delegated powers, and if it be true, as we are bound to accept it to be true, under the adjudication of the supreme court, that the only constitutional power delegated to the federal government, in respect to slaves, is the power to protect them as the property of their owners, it would seem to follow, not only as a natural, but as a necessary and irresistible, consequence, that the federal government has no criminal jurisdiction over them whatever. The case is different in regard to the states. The power and authority of the states over their slaves is sovereign, supreme, unlimited. The only power delegated by the several states to the federal government, in respect to slaves, was the "power," in the language of Chief Justice Taney, delivering the opinion of the supreme court, "the power to protect them as property." All other powers, therefore, in reference to them, were reserved to the several states, respectively. To punish slaves, therefore, and to keep them under due discipline, is thus a matter exclusively of state jurisdiction. The slave may be duly punished by the state laws for crimes of any character. He is under the absolute dominion of the state governments, but he is known to the federal government only as property, and to be protected as such,—the property of his masters, the depositaries of state sovereignty and power. And while the federal government, so far as is known, has never presumed to pass any penal law specifically embracing slaves, and has never before this prosecution asserted jurisdiction over them in criminal cases, each of the several slaveholding states, on the other hand, has enacted virtually a separate code of laws for the punishment and protection of slaves, in which, alike in the character and number of offences, and the kind and degree of punishment, due regard is had to the social, civil, and political differences between the dominant and the subject race, and in which, while proper subordination and goodly courses are carefully preserved, substantial safeguards are provided for the personal security of the slave. Nor does any inconvenience arise to the federal government from this want of criminal jurisdiction over slaves, since the state laws thus provide full and fit punishment for all offences of which a slave may be guilty. The case at bar is a case in which, as is well known, slaves have often been prosecuted and punished under the laws of the state of Virginia, in the hustings court of this city of Richmond. And the fact that this case, so

far as is known, is the first case in which, since the foundation of the government (a period of seventy odd years), this court has ever been asked to take jurisdiction over a slave, would seem very strongly to indicate the absence of any necessity for the assumption of jurisdiction, in such cases, by the federal courts.

Now it may be said, in answer to these views, that the constitution expressly gives congress the power "to establish post-offices and post roads," and therefore, by implication, power to protect them after they are established; and the splendid judgment of Chief Justice Marshall in M'Culloch v. Maryland, 4 Wheat. [17 U. S.] 417, may be cited, in which this doctrine was incidentally discussed and established. But the answer to that view is furnished by the supreme court in Dred Scott v. Sandford, 19 How. [60 U. S.] 425. And, however true and irrefragable may be the logic of Chief Justice Marshall in M'Culloch v. Maryland [supra], yet it may be said that it applies only to such persons as those over whom the federal government has general jurisdiction, and not to slaves, in respect to whom the same supreme court have solemnly declared that "the only two provisions in the constitution which point to them, and include them, treat them as property, and make it the duty of the government to protect it. No other power, in relation to this race, is to be found in the constitution; and, as this is a government of special delegated powers, no authority beyond these two provisions can be constitutionally exercised."

But, whatever may be thought of this denial to the federal government of general jurisdiction over slaves, it must be conceded by all that it can exercise jurisdiction, if at all, only in accordance with the law of their condition,—their legal status in the several states,—a matter which the federal government cannot alter or affect. And, therefore, in any light, the penalties of this act, if applied to slaves, are unconstitutional.

3. This act is unconstitutional, if it includes slaves, because it makes no compensation to the owner for property taken for the public use. It is true that the origin of the 5th amendment to the constitution, which provides that "private property shall not be taken for public use without just compensation," was the apparent necessity of protecting private property from unjust seizure in times of war; but that circumstance can scarcely be judicially held to confine the application of the great constitutional right, thus secured, to the extraordinary cases of public invasion or hostilities. Indeed, nothing is more common than for the federal government, in time of profound peace, to pay for private property taken for public use, as in the case of sites for custom houses, of which an illustration is furnished in the site of the elegant structure in which this court is held, and the post-office establishment located. Nor will it

do to say that these are all cases of fair purchase on the part of the government. That fact is but a recognition of the sacred rights of private property; and, if the government cannot, without just compensation, take the property of the citizen for one purpose, it is difficult to see how it can take it for any other purpose whatever, or, if for any one purpose, then not for all. Whenever taken at all, it is taken for some real or supposed public good, and the public, under the constitution, must pay for it. If the government cannot take a site on which to build a post-office, without paying for it, how can it seize property in the shape of slaves, whether for punishment or otherwise, in order to keep up the post-office or postal system, after it is established? Does it matter to the owner whether the slave is seized as "property," or as a "person," since, whether taken as the one or the other, the legal character of the slave as property remains the same, and the loss and injury to the owner identical? And, although it should be admitted to the fullest extent, for which it is contended, that slaves are to be viewed in the twofold character of property and persons, yet is it not perfectly apparent, even upon this hypothesis, that, whether dealt with as property or as persons, this twofold character cannot be disregarded; so that if the slave be punished as a person, he must still be paid for as property? It is quite in vain to say that it is an incident of property in slaves that it may be forfeited to the federal government, if the slave commit an offence against its laws. In the eye of the law, under the constitution of the United States, and the constitutions and laws of the several states, slave property is precisely like any other property, and to be protected as such, and has identically the same legal incidents; and if the rights of the owner of a slave in and to his labor and services can be forfeited to the federal government by reason of any action of the slave, then the anomolous absurdity would follow that the title of the owner is placed at the mercy of the property owned. It is the legal incident of no kind of property whatever to have the capacity to forfeit or affect the title of its owner by any action of its own, however true it may be that the value of a slave, or of other animate property, may be injured by negligent or vicious conduct on its own part. And this is the true, the clear, and broad distinction to be taken. If it be conceded that the federal government has the constitutional right, in self-defence, or in protection of its property or citizens, to punish slaves at all, yet, as we have seen, it must do so by penalties compatible with their legal condition, and in subordination to the vested rights of the owner. Property in slaves existed before, and exists independently of, the constitution, which did not create, but recognizes and protects, it. Johnson v. Tompkins [Case

No. 7,416]; Dred Scott v. Sandford, 19 How. [60 U. S.] 419. If the federal government punish slaves as persons, it must remember that they are property also, and, as such, must be protected and paid for when seized and used for the public good. The several states undoubtedly have the right to say that the owner shall lose his title to the services of his slave, if the slave commit an offence against the law; and some of the states have virtually done this, by prescribing the penalties of death or transportation for slaves, in certain cases, without providing compensation to the owner. This has been done as a part of their municipal polity and police in respect to slaves, upon the idea that, by tying the self-interest of the master the more closely to the common weal, greater diligence would be encouraged on his part, alike by coercion and kind treatment, to keep his slaves in due subordination and goodly courses. Therefore, in some states, the master gets only half or two-thirds of the value of the slave who is hung for crime, in others, nothing; of which the frequent consequence is that no sooner is a capital crime committed by the slave, than he is run off to another state, and sold, and public justice thwarted,—a condition of things avoided in Virginia, Maryland, and other states by paying the full value of the slave. Now the several states may do this, or they may take slave property, or property of any other kind, for public use, without just compensation. They may even annihilate all property in slaves by general emancipation, because they have absolute sovereignty and jurisdiction over the subject of slaves and slave property, and there is nothing in the constitution of the United States which forbids it, for the limitation in question applies not to the states, but to the federal government. Thus in Barron v. Mayor, etc., of Baltimore, 7 Pet. [32 U. S.] 243, Mr. (now Chief Justice) Taney, then at the bar, on rising to speak to that point, was stopped by the court, and Chief Justice Marshall, delivering its opinion, said: "The question presented is, we think, of great importance, but not of much difficulty"; and decided that "the provision in the 5th amendment of the constitution, declaring private property shall not be taken for public use without just compensation, is only a limitation of the power of the United States; it is not applicable to the legislation of the several states." While, therefore, the several states are at full liberty, in the exercise of sovereign power, to take private property for public use without compensation, no such power is vested in the federal government. The only power, say the supreme court,—certainly, the paramount duty,—of the federal government, in respect to slaves, is to protect the rights of property of their masters in and to them. To seize and carry them away, and keep them out of the service of the owner, and beyond the jurisdiction of his sovereign state, for the emolument or advantage of the federal government, without compensation to the owner, would certainly be a strange way of showing that protection. Whether the slave be seized and carried away to be employed directly on works of public utility for the federal government, or to be punished by being employed, in "imprisonment and confinement to hard labor," for the profit, advantage, or benefit of the federal government, matters but little to the owner, whose property is thus appropriated without compensation; and it amounts to but mockery to tell him that his property is used or destroyed by the government in self-defence. Private property is always taken by the government in self-defence, or for self-advantage. The manner in which, or the purpose for which, or the cause or necessity for which the government proposes to use or appropriate slave property, or any other property, without just compensation, cannot in any wise alter or affect the obligation to pay for it. Whether, for instance, in time of war, a slave, in a sudden emergency, be pressed into public service (as at the defence of New Orleans), either as a teamster, or as an artillery man, or as a soldier of the line, whether he be used in the capacity of "property" or a "person," to work or fight, cannot vary the constitutional obligation and duty of the government to pay the owner the full value of his services, during the time the slave is thus employed for the public good, or to pay for his whole value in case of his permanent detention or of his being killed. The public must be the judge of its own necessities, and of the manner and time of taking private property for public use, as well as of the uses and purposes for which it is to be employed; but this fact cannot abrogate its responsibility to pay for the property it thus appropriates to its real or supposed necessities. Least of all can it be urged that, in punishing slaves by fine and imprisonment, or by imprisonment until the fine be paid, where fine alone is imposed, the federal government would not take them as property, but as persons, responsible to penal laws, and that the loss to the owner of his property follows incidentally as a natural and unavoidable consequence of property in slaves; for this assumes, first, that slaves can be punished by penalties incompatible with the fundamental law of their condition; it assumes, secondly, that the loss or damage inflicted upon the owner is incidental, which is not the fact; it assumes, thirdly, that if such loss be incidental, that circumstances would affect the right and principle of compensation. Certainly the federal government can inflict no penalty upon the slave which is inconsistent with, or repugnant to, the law of his condition; for it must be conceded that the federal courts are bound to respect and to protect that law, the status of the slave being a matter exclusively of state jurisdiction. It must be

equally apparent that the loss resulting to the owner from the service and detention, or destruction, of his property, is direct and positive,. and susceptible of clear and easy calculation; such as is made every day in actions of detinue or trover for slaves. Nor, if the fact were otherwise, would the conclusion be different. For, if the loss to the owner of the labor and services of the slave be the certain and inevitable consequence of its seizure and detention or annihilation, it matters nothing, in substance, whether that loss be direct or incidental. The fact of the loss to the owner by the appropriation of his private property by the public, for its own emolument or use, or in furtherance of its policy, is that which constitutes the gravamen and justice of the charge, and which must fix upon.the public the responsibility of paying for it. And so are all the analogies of the law. Whether, for instance, a defendant is liable in trespass vi et armis for a direct injury, or in case for consequential damages, often presents a nice question in special pleading; but the fact of his liability, in law and in justice, is equally as certain and well settled in the one case as in the other, and the recovery as great, according to the evidence of the actual loss sustained. The truth is that the whole idea of the legal responsibility of the slave to the federal government for offences against its laws, and therefore of the liability of the owner, incidentally, to the loss of his property in consequence of the punishment of the slave by imprisonment or death, rests, it is respectfully submitted, upon a fallacy, which is the result of that radical misconception of the legal status and relations of slaves which has been pointed out and established in another part of this argument. The slave is a chattel in the eye of the law, and nothing more. He has no civil or political rights, and therefore no corresponding responsibilities or relations to the state. He is punishable by statute, when included by name, description, or necessary implication, as a natural person; but always, and only, in a manner compatible with the law of his condition as a chattel. The several states, having sovereign and absolute jurisdiction over the subject, may or may not, according to their views of municipal or domestic policy, compensate the owner for the value of the slave, in case of his transportation or capital punishment. But that circumstance in no wise affects the fact, which is the grand substratum of the only consistent and rational system of jurisprudence upon the subject, that slaves, as such, being mere property, have no civil or political rights, obligations, or relations, and are therefore incapable of being held to the same kind or degree, or to any kind or degree, of responsibility as persons having civil and political rights, obligations, and relations. Their punishment is always, and necessarily, a matter of positive statute, and,

ex virtute magistri, based, not upon any recognized civil, social, or political obligation of the slave to obey the law, but upon the sovereign and supreme mandate of his master, embodied in the law, the observance of which is enforced by penalties inflicted for its violation. The slave is punishable, but upon a different principle, and in a different manner, and often in a different degree, from that in which a civil and political person is punished. He is punished as a matter of chastisement and discipline, according, indeed, to principles of natural justice and moral obligation; but.certainly not upon any hypothesis of violated civil or political obligations, the sanctity of which is to be enforced or preserved by the surrender or forfeiture by him, in whole or in part, of civil or political rights and franchises, such, for instance, as the deprivation of property or of liberty, or of the capacity to hold or take offices of public emolument, honor, and trust. Obviously, this vast radical and all-pervading difference results necessarily from the established and conceded absence, on the part of the slave, of all civil or political rights and relations to the state; that organized sovereignty whose will is his law, of which he forms no constituent element, in which he has no voice or influence, and to which he stands as a chattel, the subject of property, and the object of the civil rights of others, the component parts of that supreme and sovereign power over and above him. This was the legal status of the slave at the time of the adoption of the federal constitution, and it so continues. That instrument recognizes and protects slavery as it then existed, and still exists, in the several slave-holding states; and, therefore, in the penal laws of the federal government, in regard to slaves, it must recognize and respect that great fundamental fact. This, therefore, being true, since, in a legal sense, —in the sense of obligation correlative to right, in the sense of the maxim jus et obligatio sunt correlata,—the slave is not bound to obey the laws, either state or federal, he cannot be punished upon that hypothesis. He cannot be punished by the forfeiture or deprivation of any civil or political right, possession, franchise, or immunity; he has none to forfeit or lose. Still less can he, by any act of his own, directly or incidentally, forfeit, transfer, or affect the legal rights of others,—the right of property, for instance, in his labor and services, the right of property in and to himself and his posterity, which, by the law of his condition, is vested in his owner. While, therefore, he is certainly punishable for crime, yet, so far as the federal government is concerned, beyond all question he cannot be punished as a civil or political person,—a person having civil or political rights, obligations, or responsibilities,—but he must be punished, if at all, in strict accordance with the law of his condition, in profound respect to his establish-

ed legal status, and only and always in perfect subordination to the vested rights of his master in and to him as property, guarantied and secured, as they are, in the most positive and emphatic manner, by the constitutions and laws of the several sovereign states in which he exists, and sanctioned and shielded by the constitution and laws of the United States. In so far, then, as this act of congress attempts to punish slaves by pecuniary fines and imprisonment, it is clearly unconstitutional; and, in so far as it attempts to do this, without providing just compensation to the owner for the detention and loss of his property, thus taken by the public for its own use and purposes, it is still more clearly and manifestly unconstitutional and void.

TANEY, Circuit Justice. The prisoner (Amy) in this case was indicted for stealing a letter from the post-office, containing articles of value, particularly described in the indictment. It appeared in evidence on the trial that she was at the time the offence was committed, and at the time of trial, a slave, and her counsel therefore prayed direction of the court to the jury that the prisoner was not embraced in the description of persons to which the law in question applied, and upon whom it intends to inflict punishment. The motion was overruled by the court, and the prisoner, under its direction, was found guilty by the jury, as charged in the indictment; and a motion is now made to set aside the verdict, and grant a new trial, upon the ground that the instruction asked for ought to have been given, and that the court erred in refusing it. The act of March 3, 1825 (section 22), under which the prisoner is indicted, provides that, if any person shall steal or take a letter from the mail, or any post-office, the offender shall, upon conviction thereof, be imprisoned not less than two, nor more than ten, years.

It has been argued in support of the motion that a slave, in the eye of the law, is regarded as property; and, as the act of congress speaks only of persons, without any reference to the property of the master, and makes no provision to compensate him for its loss, it was not intended, and does not operate, upon slaves.

It is true that a slave is the property of the master, and his right of property is recognized and secured by the constitution and laws of the United States; and it is equally true that he is not a citizen, and would not be embraced in a law operating only upon that class of persons. Yet, he is a person, and is always spoken of and described as such in the state papers and public acts of the United States. Thus, the two clauses in the constitution which point particularly to property in slaves, and sanction its acquisition and provide for its protection, both speak of them as persons, without any other or further word of description. The clause which

authorized their importation declared "that the migration or importation of such persons as any of the states now existing shall think proper to admit shall not be prohibited by congress prior to the year one thousand eight hundred and eight." And the clause intended to protect the right of property in the master provides "that no person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered upon claim of the party to whom such labor or service may be due." And the third clause of the second section of the first article, which apportions the representation in congress among the several states, describes them by the same word, and provides "that representation and direct taxes shall be apportioned among the several states which may be included within this Union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons"; and under this description slaves have always been enumerated in the census, and the slave-holding states represented in congress according to their numbers, in the proportion specified, and no one has ever questioned the right of the slave-holding states to this representation, or doubted the meaning of the words "all other persons." It is evident, therefore, that the word "person" is used in the constitution to describe slaves, as well as freemen, and a court of justice would not be justified in refusing to give the same word the same construction when it is used in an act of congress, unless there was something in the object and policy of the law, or in the provisions with which the word was associated, which manifestly indicated that it was used in a different and narrower sense, and intended to be confined to persons who are free.

There is certainly nothing in the object and policy of the law in question from which it can be inferred that slaves were not intended to be punished for the offences therein enumerated. The offences were as likely to be committed by slaves as by freemen, and the mischief is equally great whether committed by the one or the other; and, if a slave is not within the law, it would be in the power of the evil disposed to train and tutor him for these depredations on the mails and post-offices, and, as the slave could not be a witness, the culprit, who was the real instigator of the crime, would not be brought to punishment. And if the slave himself is not within the law, the crime might be committed daily, and with perfect impunity, and all of the safeguards which congress intended to provide for the protection of its mails and post-offices would be of no value. Such a construction would defeat the whole evident object and policy of the law, and would

rather tempt to the commission of these offences by the certainty of impunity, than to prevent them by the fear of punishment.

In expounding this law, we must not lose sight of the twofold character which belongs to the slave. He is a person, and also property. As property, the rights of the owner are entitled to the protection of the law. . As a person, he is bound to obey the law, and may, like any other person, be punished if he offends against it; and he may be embraced in the provisions of the law, either by the description of property or as a person, according to the subject-matter upon which congress or a state is legislating.

It is true, that some of the offences created by this act of congress subject the party to both fine and imprisonment, and it is evident that the incapacity and disabilities of a slave were not in the mind and contemplation of congress when it inflicted a pecuniary punishment; for he can have no property, and is also incapable of making a contract, and consequently could not borrow the amount of the fine; and, a small fine, which would be but a slight punishment to another, would, in effect, in his case, be imprisonment for life, if the court adopted the usual course of committing the party until the fine was paid. And we think it mus' be admitted that, in imposing these pecuniary penalties, congress could not have intended to embrace persons who were slaves, and we greatly doubt whether a court of justice could lawfully imprison a party for not doing an act, which, by the law of his condition, it was impossible for him to perform; and to imprison him, to compel the master to pay the fine, would be equally objectionable, as that would be punishing an innocent man for the crime of another.

The case before us, however, does not involve this question, and we must not be understood as expressing a decided opinion upon it. The offence of which the prisoner has been found guilty is punished by the law by imprisonment only, and that punishment is, without doubt, looked to with as much apprehension and fear, and felt as severely, by the slave as it is by the freeman. But, although the difficulty above mentioned will arise in passing the sentence of the law where both fine and imprisonment are imposed, yet that circumstance will not justify the court in departing from the sense and meaning in which the word "person" is used in the constitution; especially when it is obvious that the whole object and purpose of this act of congress would be defeated if the word "person," as used in it, was held not to embrace a person who was a slave. Nor do we doubt the authority of congress to pass this law. It is true that no compensation is provided for the master for the loss of service during the period of imprisonment. But the clause in the 5th amendment of the constitution which declares that private property shall not be taken for public use with-

out just compensation cannot, upon any fair interpretation, apply to the case of a slave who is punished in his own person for an offense committed by him, although the punishment may incidentally affect the property of another to whom he belongs. The clause obviously applies to cases where private property is taken to be used as property for the benefit of the government, and not to cases where crimes are punished by law. And if, in one of those contingencies which sometimes arise in time of war, a slave is pressed by the proper authority into the public service, in order to be employed as a laborer or teamster, or in any other manner, this clause of the constitution undoubtedly makes it the duty of congress to compensate the master for the loss he sustains. In such cases, and in all other cases where the slave is taken and used as property for the benefit of the government, the government acts directly and exclusively upon the master's right of property, without any reference to the personal rights or personal duties of the slave towards the government. It deals with him as property only, and not as a person, and, as it takes property to be used for the public emolument, it must pay for it.

But punishment for crime stands upon very different principles. A person, whether free or slave, is not taken for public use when he is punished for an offence against the law. The public, in such cases, acts in self-defence, to preserve its own existence, and protect its members in their rights of person and rights of property; and the loss which the master sustains in his property is incidental, and necessarily arises from its twofold character, since the slave, as a person, may commit offences which society has a right to punish for its own safety, although the punishment may render the property of the master of little or no value. But this hazard is unavoidably and inseparably associated with this description of property, and it can furnish no reason why a slave, like any other person, should not be punished by the United States for offences against its laws, passed within the scope of its delegated authority.

It is not for the court to say whether the government is or is not bound, in justice, to compensate the master for the loss of service during the time the slave shall be imprisoned. The question does not depend upon any provision in the constitution, nor has it been provided for by any act of congress; and, as the matter now stands, it is a question for the decision of the political department of the government, and not for the judicial; and, consequently, is one upon which this court forbears to express an opinion. It would seem, from the statements in the argument at the bar, that in different slaveholding states different opinions upon the subject have been adopted and acted on by the constituted authorities.

In maintaining the power of the United States to pass this law, it is, however, prop-

er to say that, as these letters, with the money in them, were stolen in Virginia, the party might undoubtedly have been punished in the state tribunals, according to the laws of the state, without any reference to the post-office or the act of congress; because, from the nature of our government, the same act may be an offence against the laws of the United States and also of a state, and be punishable in both. This was considered and decided in the supreme court of the United States in the case of Fox v. Ohio, 3 How. [44 U. S.] 433, and in the case of U. S. v. Marigold, 9 How. [50 U. S.] 560; and the punishment in one sovereignty is no bar to his punishment in the other. Yet in all civilized countries it is recognized as a fundamental principle of justice that a man ought not to be punished twice for the same offence; and, if this party had been punished for the larceny in the state tribunal, the court would have felt it to be its duty to suspend sentence, and to represent the facts to the president, to give him an opportunity of ordering a nolle prosequi, or granting a pardon. But there does not appear to have been any proceeding in the state tribunals, or under the state laws, to punish the offence, and, as the prisoner has been proceeded against according to the laws of the United States, and found guilty by a jury selected and impaneled according to the act of congress, we see no ground for setting aside the verdict or suspending the sentence, and the motion is therefore overruled.